**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0546n.06

No. 10-3284

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**

***Aug 08, 2011***

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| JOHN HREHA, | ) | **OPINION** |
| | ) | |
| Defendant-Appellant. | ) | |
| _____ | ) | |

**Before: SUTTON and WHITE, Circuit Judges; STAFFORD, District Judge.**[*]

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant John Hreha (Hreha) appeals his above-Guidelines sentence imposed after he pleaded guilty to one count of bank fraud, in violation of 18 U.S.C. § 1344. We **REVERSE** and **REMAND** to the district court for proceedings consistent with this opinion.

**I.**

Hreha was employed as a data supervisor at the Bank of Magnolia (the Bank) in Magnolia, Ohio from 1990 until 2008. His starting salary was $19,000 per year and his ending salary was $37,000 per year. In early 2000, Hreha noticed an internal accounting error as a result of which it appeared that there was a shortage in the Bank's ATM account. Hreha then created a false electronic

_____

[*]The Honorable William H. Stafford, Jr., Senior United States District Judge for the Northern District of Florida, sitting by designation.

1

transaction that showed a deposit into this account, making it appear that approximately $35,000 was accounted for on a general bank ledger between the Bank's ATM account with the National City Bank, which the Bank used to receive funds.

Because the Bank did not notice either the initial accounting error or the large false transaction concealing the error, Hreha decided to use similar false transactions to obtain smaller amounts of money from customer bank accounts for his personal use. From approximately February 2000 until January 2008, Hreha created false transactions in $1,000 increments, charging the amounts to various customer accounts while ultimately transferring the funds into his personal account. He then reversed checks he had written on his personal account, making it appear that the funds were never withdrawn from his account. To aid him in this scheme, Hreha recruited Denise Conley (Conley) and Carla Woods (Woods), two lower-level employees in the Bank's data processing group. Specifically, Hreha instructed Conley and Woods to process duplicate cashier's checks and deposit these checks into their personal savings accounts. Hreha would then withdraw the money from these accounts "in an effort to pay back the money that [Hreha] had taken from [the Bank.]" Through this scheme, Hreha obtained $245,832.32, Conley obtained $5,326.27, and Woods obtained $22,855.77.

In January 2008, Hreha came forward and told the president of the Bank about the scheme. The Bank had not discovered the fraud prior to this time. Hreha resigned from his position and signed over his retirement account, containing $71,912.48, to the Bank as restitution before charges

2

were filed against him.  Hreha subsequently had trouble finding employment.  On November 10, 2008, Hreha filed for bankruptcy and his home was foreclosed on.

On November 18, 2009, Hreha, Conley, and Woods were each charged with one count of bank fraud, in violation of 18 U.S.C. § 1344, and aiding and abetting under 18 U.S.C. § 2.  Hreha was arraigned on December 8, 2009.  He waived indictment and pleaded guilty to the single count contained in the information.  Hreha also executed a plea agreement, which did not discuss Hreha's sentence or Guidelines range but did stipulate that the applicable offense level, prior to the anticipated three-level downward adjustment for acceptance of responsibility, was nineteen.

Conley was sentenced on February 24, 2010.  The district court asked Conley whether she knew what Hreha did with the $245,832.32 that he had obtained from the Bank.  "Conley stated that she knew Hreha to have the newest in electronics and nice cars."  She denied knowing anything else about whether and how Hreha spent the money.  The district court orally sentenced Conley to a term of one day in prison, to commence immediately following her sentencing hearing.

Hreha's sentencing hearing took place about one hour after Conley's.  The parties agreed that there were no objections to the PSR.  The district court determined that, after a three-level downward adjustment for acceptance of responsibility, Hreha's total offense level was eighteen and his criminal

3

history category was I.[1]  As a result, the district court concluded that Hreha's Guidelines range was twenty-seven to thirty-three months.

After giving Hreha an opportunity to speak, the district court asked him "where did the money go?  This is approximately, if I accept the $275,000, over a period of what, eight years or thereabouts, we're talking about an additional $35,000 a year, if I average it out, tax-free.  So where did the money go?"  Hreha responded "I just was in over my head with bills. I had a couple kids in college.  I was trying to keep their slate clean and just doing too much."  The district court noted that Hreha's financial statement reflected no real estate and stated that Hreha owned a car worth $1,500. Hreha explained that he had lost all his assets through bankruptcy.

The district court then stated

> I guess – sir, I guess I'll be candid with you. I just don't find this to be credible.  And if I don't find it to be credible, if I for some reason think you're misleading me about where the money went, then that makes it more difficult for me in imposing a sentence here because we're talking about $275,000.  I'm a little bit familiar with Magnolia. It's a community where the cost of living is relatively modest.
>
> And I don't see you have anything to show for all this money.  I don't see cars, houses, jewelry, any of the kinds of things that one would accumulate spending – using this kind of money over a period of time.
>
> So I would strongly encourage you that candor is a good thing.  If for some reason I think that – I don't get a better answer then just sort of a vague, well, I was in over my head, then I'm going to be led to believe either there is money somewhere

---

[1]The plea agreement had contemplated a total offense level of sixteen based on a loss amount of more than $120,000.  In arriving at this loss amount, the government simply subtracted Hreha's restitution to date, $71,912.48, from $245,823.32.  However, the probation officer recommended a total offense level of eighteen based on a loss amount of more than $200,000 by taking into account relevant conduct – the loss amounts ascribed to Conley and Woods.

else and/or you're wasting it or spending it on things other than you've disclosed here in open court. And that will not be a good thing. That may increase the guidelines. That may mean you're not accepting responsibility. Or that may mean I need to vary upward because there is something else going on here besides, gee, I'm just a spendthrift. Not for this kind of money.

So do you want to be frank with me, candid with me, or if you want to maintain the position that you are telling me the truth, then I'll be looking at the probation officer, talking to him about the financials and what information there may be to truly establish where this money went.

Hreha responded "I am telling you the truth, sir. I was in over my head. I bought cars for my kids.

You know, I paid cash for them because I took the money from this."

In response, the district court again questioned Hreha, asking him "[w]hat kind of cars did

you buy. How much did you spend? How much did you spend on college? Let's be specific here.

What evidence do you have to support these various purchases?" Hreha responded:

I don't remember what I spent on my son's college or – my daughter went away to school at Stark State for a year, and I think it was like 11 thousand bucks. And I just – I paid for all of that for her.
. . . .

There were times when my wife wasn't working because she had over-used her time off because she has fibromyalgia, so she missed work. So there was only my income coming in.

And we would go on vacation. I mean, vacations would cost us two or three thousand. We'd go to Myrtle Beach. And I just used it for that. I mean, over eight years, you know, we went on vacation every single year with my kids. I have none of this money saved up. I have nothing.

And I'm being – and I'm not lying to you sir.

The district court continued to question Hreha's story, stating that it just did "not make sense

. . . that this much money is stolen from the bank and there is not one thing to show for it, and I get

. . . vague answers about what was spent and how it was spent." The court took a short break to review Hreha's bankruptcy filing, and then allowed the parties to examine and respond to the filing. The district court also made the filing a part of the record while noting that it cast "grave doubt on [Hreha's] credibility and the accuracy of the statements that he ha[d] made to the [court] about his use of nearly a quarter of a million dollars in this particular case."

Hreha's counsel responded, "I'm not sure that this bankruptcy filing goes back and captures the [eight] years['] worth of things. . . . Some of those items [that are not showing up on this], it's my understanding, [are] car payments in excess of $500." Counsel requested that he be allowed to "provide the government or the probation department with any records whatsoever that would show to the [district court] where some of the money went." The district court stated that it did not "feel a need to continue the hearing because [it thought it had] all the information [it] need[ed]." The court reasoned

> I pick up the bankruptcy and I see student loans here of nearly $80,000. Now, that doesn't quite square with the fact that yes, I'm using this money to pay for my students' college.
>
> I look at the inordinate amount of debt here that's been accrued. I look at the type of cars. I look at the household goods. Everything set forth in this bankruptcy proceeding leads me to believe, candidly, that the monies that were stolen from the [Bank] went somewhere else. Now, whether it's gambling, whether it's adult entertainment, I'm not sure, but it has a bearing on the Court's sentence so I can determine an appropriate sanction and what may be the appropriate terms of supervised release.

Prior to imposing Hreha's sentence, the district court briefly described the nature and circumstances of the offense and then stated as follows:

The Court would note for the record that this conduct – this defendant's conduct, at least from what I have read, led to two other co-workers being involved in this unlawful activity, that being Ms. Woods and Ms. Conley, and resulted in their loss of their employment and their obvious culpability in this matter.

And I am of the view, based on what I've seen and heard and read, that this defendant is the leader. And without his involvement, the other two may not have been involved, given their long-time employment at the [Bank].

The abuse of position of trust under 3B1.3 is found not to apply. However, as an aside, there is an argument to be made that that certainly could have applied in this case and was not calculated in the guidelines.
. . . .

The history and characteristics of the defendant. He's 51 years old. He has no prior criminal record. He's married and has three children. He indicates he was raised in a loving and supportive family. He indicates he does not suffer from any physical, mental, or substance abuse issues.

From 1990 to 2008 he was employed at the [Bank] where he committed the instant offense. He is currently unemployed and has had trouble maintaining employment since this instant offense.

The defendant reported taking the money to pay for bills. The Court, candidly, does not believe that to be the case.

I believe, based on the information I have as outlined in the defendant's bankruptcy, based upon the amounts involved, based upon the probation officer's investigation, etcetera, this money was used for some other purpose. Whether it be legal or illegal, the Court cannot determine. Whether it be gambling, whether it be drugs, whether it be alcohol, which the defendant denies, or whether it be in some sort of adult entertainment activities, I do not know.

But the defendant's, in my view, lack of candor and unwillingness to disclose to this Court where these funds may have gone gives this Court great difficulty in deciding an appropriate sanction or, more importantly, imposing conditions of supervised release that will allow the Court to make certain this defendant does not engage in conduct of this nature.

> If these funds are being used for some form of addictive behavior, etcetera, then it's likely until that kind of issue is addressed, this conduct will continue again. There will be issues of recidivism.
>
> And the Court – obviously, all of those things fold into the Court's imposition of the need for the sentence imposed, deterrence, protect the public, improve the offender's conduct. I've been deprived of that by what I believe to be the defendant's intentional[ly] vague responses to the Court's inquiry.
>
> Therefore, having addressed all of those things, the kinds of sentences available is the statutory period is up to 30 years. The guidelines is 27 to 33 months. And as I've indicated, I will vary above those guidelines for the reasons I've just stated.
>
> Sentencing disparities. Defendants with similar offense levels and criminal history scores would fall within the same sentencing range as the defendant, however, I candidly believe – my experience has been that most defendants will be able to more accurately disclose clearly, given the amounts in question here, where the funds went, how they were expended, who may have received same, etcetera. None of that applies here.
>
> . . . .
>
> [A]nd just so we note for the record, the other thing that makes this Court's sentence – why I'm varying is because [you] destroyed in some respects the lives of two other ladies who worked in that bank with you. And but for you, and whatever addiction or whatever the cause may be of your misappropriation of this money, you took them down with you. And that warrants a harsh sanction as well.

The district court then sentenced Hreha to sixty months' imprisonment. No objections were made

following the imposition of the sentence. [2]

---

[2]After sentencing Hreha and Woods, the district court "became concerned that Conley had not been truthful during her allocution concerning what she knew about where Hreha may have spent" his share of the money based on Woods's representations at her afternoon sentencing hearing that Hreha spent a lot of money at strip clubs and that Conley was aware of this fact. As a result, the district court ordered Conley returned to the courtroom late in the afternoon on February 24. Because Conley's attorney could not be present at this time, the district court set a hearing for the following day "to address more fully what Conley had said during her allocution."

On March 4, 2010, Hreha timely appealed his judgment and sentence.

**II.**

Hreha argues that his sentence was procedurally unreasonable because the district court (1) failed to consider all of the 18 U.S.C. § 3553(a) factors and focused primarily on how Hreha spent the proceeds of the bank fraud; and (2) failed to properly calculate the Guidelines range by miscalculating the loss amount and disregarding the parties' stipulations in the plea agreement. He also claims that his sentence was substantively unreasonable because it was arbitrary and depended entirely on "one factor which was not an element of the offense, and was not a necessary component to fashion a proper sentence." The government contends that Hreha's sentence is procedurally and substantively reasonable.

We review sentences for reasonableness. *United States v. Holcomb*, 625 F.3d 287, 291 (6th Cir. 2010); *see also Gall v. United States*, 552 U.S. 38, 46 (2007). Reasonableness is determined "using the abuse-of-discretion standard of review." *United States v. Webb*, 616 F.3d 605, 609 (6th

---

On February 25, 2010, the district court placed Conley under oath and read back its questions and her answers from the previous day on the issue of where Hreha spent the money. The district court then posed these questions to Conley again. Conley stated "that she had heard from Woods that Hreha had spent a lot of time in adult entertainment establishments." When asked by the district court why she did not mention this fact the previous day, she said "that she did not have firsthand knowledge of Hreha frequenting these establishments, nor specific knowledge of Hreha using the monies he embezzled for that purpose, but had only heard that information from Woods." Based on this information, the district court announced that it was considering modifying Conley's sentence, as it had not yet been journalized, and asked the parties to brief the issue. Following the submission of briefs, the district court issued an order stating that it lacked the authority to alter Conley's sentence.

Cir. 2010) (citation omitted). "Review for reasonableness has both procedural and substantive components." *Id.* (citation omitted).

When reviewing a sentence for procedural reasonableness, we look at three factors: whether the district court "(1) properly calculated the applicable advisory Guidelines range; (2) considered the other § 3553(a) factors as well as the parties' arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen. . . ." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007). To determine if the district court properly calculated the applicable Guidelines range, we review the district court's findings of fact under the clear-error standard and its legal conclusions regarding application of the Guidelines de novo. *Id.* at 579. "Although the district court need not explicitly reference each of the § 3553(a) factors, there must be sufficient evidence in the record to affirmatively demonstrate that the court gave each of them consideration." *United States v. Battaglia*, 624 F.3d 348, 351 (6th Cir. 2010).

A sentencing explanation is adequate if it allows for meaningful appellate review, *Gall*, 552 U.S. at 50, which is accomplished by setting forth enough of a statement of reasons to satisfy the appellate court that the sentencing court had considered the parties' arguments and had a reasoned basis for choosing the sentence imposed, *Rita v. United States*, 551 U.S. 338, 356 (2007). The "sentencing [court] is not required to explicitly address every mitigating argument that a defendant makes, particularly when those arguments are raised only in passing." *United States v. Madden*, 515 F.3d 601, 611 (6th Cir. 2008). Indeed, the Supreme Court has made clear that "[t]he appropriateness

of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances" that are left "to the judge's own professional judgment." *Rita*, 551 U.S. at 356.

Because we find that Hreha's sentence is procedurally unreasonable, we need not reach the issue whether his sentence is substantively unreasonable.

The district court was clearly focused on what Hreha did with the proceeds of the bank fraud – a consideration that is not pertinent in scoring the Guidelines, but potentially relevant to the sentencing factors under § 3553(a). Although the district court speculated as to what Hreha may have done with the money, it did not specifically state whether it was imposing a sentence that was nearly double the maximum recommended by the Guidelines because it believed that Hreha had not disgorged all of the proceeds of the bank fraud or that he had spent the proceeds in supporting an addiction. Without further explanation by the district court, our review of the record reveals no ready support for either theory.

The probation department did not find that Hreha had been abusing alcohol or drugs, gambling, or engaging in any other inappropriate activities. Conley lacked any personal knowledge that Hreha patronized strip clubs, Woods's remarks were not made under oath, and none of the statements regarding this issue were made at Hreha's sentencing hearing.

Further, Hreha confessed to the crime before it was discovered and promptly turned over nearly $72,000 in savings as partial restitution. The court allowed a three-level reduction for acceptance of responsibility. Absent additional explanation and support in the record, the court's

treatment of the "what-happened-to-the-money" issue seems inconsistent with Hreha's accepting responsibility.

The district court also appears to have drawn unwarranted conclusions about the amount of money Hreha had at his disposal. Hreha's salary during the time of the offense was no more than $37,000 per year, pre-tax, and less for previous years. The proceeds of the bank fraud added about $31,000 per year to Hreha's yearly income. It is entirely possible that a person who was supporting a family of five, three of whom were college-age children, would spend $68,000 per year (assuming no taxes were paid) and would incur some debt. Additionally, the bankruptcy filing on which the district court relied reflected Hreha's financial state of affairs *after* he had lost the bank position and could not find another. Although the court might have had good reasons for questioning Hreha's inability to provide a more specific account at sentencing, such reasons are not evident on this record.

Moreover, when it became apparent that the district court was heading down a path not contemplated by Hreha or the government, Hreha's counsel asked for an opportunity to provide a more detailed explanation of Hreha's finances and "where the money went." The district court declined to allow an adjournment to permit Hreha to supplement the record and attempt to address the court's concerns, concluding that it had sufficient information to determine that Hreha was not telling the court the truth. Because it is not evident from the bankruptcy filing alone that Hreha was being untruthful and because the district court never explained what aspects of the bankruptcy record

12

cast doubt on Hreha's explanations, the court should have permitted counsel an opportunity to present evidence supporting Hreha's account of what he did with the money.

Here, Hreha's "sentence in excess of the Guidelines range was imposed without . . . a statement of reasons for such a variance. Section [18 U.S.C. § 3553(c)(2) requires not only a statement of reasons, both stated 'in open court' and written in a judgment and commitment order, but also that those statements be made with 'specificity.'" *United States v. Blackie*, 548 F.3d 395, 403 (6th Cir. 2008). Further, by refusing to allow Hreha to supplement the record, the district court effectively declined to consider his arguments regarding how he spent the proceeds of the fraud. Because the district court's sentencing explanation does not demonstrate that the district court had considered Hreha's arguments and had a reasoned basis for choosing the sentence imposed, Hreha's sentence is procedurally unreasonable.

## III.

For the abovementioned reasons, we **REVERSE** Hreha's judgment and sentence and **REMAND** to the district court for proceedings consistent with this opinion.